UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA and FRANK
J. KELLEY, ATTORNEY GENERAL FOR THE
STATE OF MICHIGAN, EX REL MICHIGAN
NATURAL RESOURCES COMMISSION, AND
DIRECTOR OF THE MICHIGAN
DEPARTMENT OF NATURAL RESOURCES,

        Plaintiffs,

        v.

WAYNE COUNTY, MICHIGAN; CITY OF ALLEN
PARK; CITY OF BELLEVILLE; TOWNSHIP OF
BROWNSTOWN; CITY OF DEARBORN HEIGHTS;
CITY OF ECORSE; CITY OF LINCOLN PARK;
CITY OF RIVER ROUGE; CITY OF SOUTHGATE;
CITY OF TAYLOR; TOWNSHIP OF VAN BUREN;
CITY OF WYANDOTTE; CITY OF RIVERVIEW;
SOUTHGATE-WYANDOTTE RELIEF DRAINAGE
DISTRICT; AND ECORSE CREEK POLLUTION
ABATEMENT DRAIN,

        Defendants.

                              /

Civil Action No.
87-70992
Hon. John Feikens

**OPPOSITION OF PLAINTIFFS
THE UNITED STATES AND THE STATE OF MICHIGAN
TO DEFENDANTS' MOTION AND RENEWED MOTION
TO AMEND THE MAY 24, 1994 CONSENT DECREE AND TO
<u>RIVERVIEW'S MOTION AND RENEWED MOTION TO ALLOW BYPASS</u>**

## I.    <u>INTRODUCTION</u>

Plaintiffs, the United States of America ("United States") and the State of Michigan (the

"State") (collectively "Plaintiffs"), by their attorneys, submit this Opposition to the Defendants'

Motion and Renewed Motion to Amend the May 24, 1994 Consent Decree to extend the time for



closure of certain bypass points ("Defendants' Motion to Amend") and to Riverview's Motion and Renewed Motion to Allow Bypass ("Riverview's Motion").

In their Motions, Defendants seek extraordinary relief: an order from this Court relieving them of obligations contained in a 1994 Consent Decree that was negotiated at arm's length over a period of years with the supervision and input of this Court and two court-appointed monitors, Dr. Jonathan Bulkley and Mr. Charles Moon. Defendants do not make their extraordinary request on the basis of any facts unknown at the time of the negotiations. There were heavy rainfalls and basement flooding before 1994. Rather, Defendants seek to be relieved of the bargain they struck because it has become politically unpopular. Defendants have presented no evidence demonstrating that compliance with the Consent Decree obligations they now seek to avoid caused basement flooding in 1998 and 2000 because they cannot. Compliance with a Consent Decree that required Defendants to significantly expand their retention capacity was not a cause of basement flooding.

Granting Defendants' request will represent a major blow to the environment. Bypass points where Defendants can discharge untreated sewage directly to the waters of the United States will remain open, thus shielding Defendants from the incentives they need to properly operate and maintain their systems so that the dual goals of clean water and no basement flooding can be achieved. Granting Defendants' request also will undermine the ability of the United States and the State to enforce the law. We cannot effectively litigate or settle cases if it is perceived that our consent decrees are neither final nor binding.

Two times in the past Plaintiffs have agreed to Defendants' requests for Consent Decree modifications, thus demonstrating that Plaintiffs recognize that modification requests based on

2

sound technical and factual reasons should be agreed to. Defendants current request, however, is unjustified. Their request is based on a false premise and subverts the intent of the parties when the Consent Decree was negotiated.

## II.      **BACKGROUND**

### A.      **The Complaint, Amended Complaint, Negotiating Process, and Consent Decree**

On March 18, 1987, the United States and the State filed a complaint against Wayne County ("County") alleging that the County had violated the Clean Water Act, 33 U.S.C. § 1251 et seq., ("CWA"), the Michigan Water Resources Commission Act ("MRCA"), MCL 321.1 et seq., and the terms and conditions of National Pollutant Discharge Elimination System ("NPDES") Permit No. MI0021156. On October 26, 1988, the United States and the State filed a First Amended Complaint which added claims against the City of Allen Park, the City of Belleville, the Township of Brownstown, the City of Dearborn Heights, the City of Ecorse, the City of Lincoln Park, the City of River Rouge, the City of Riverview, the City of Romulus, the City of Southgate, the City of Taylor, the Township of Van Buren, and the City of Wyandotte (the "Downriver Communities"), and against the Southgate-Wyandotte Relief Drain Drainage District and the Ecorse Creek Pollution Abatement Drain Drainage District (the "Drainage Districts"). The Plaintiffs alleged that the Downriver Communities and the Drainage Districts, like Wayne County, had violated the CWA, the WRCA, and NPDES Permit No. MI0021156.

Between 1988 and 1994, the United States, the State, the County, the Downriver Communities and the Drainage Districts engaged in thorough and extensive negotiations in an effort to resolve the claims alleged in the Complaint and Amended Complaint without extensive

3

litigation. Scores of individuals were involved in the negotiation process: technical personnel employed by the regulatory agencies and the defendants; outside consultants hired by some of the parties; political personnel representing some of the defendants; and lawyers representing each of the parties. The negotiating process was lengthy and time-consuming. All claims were reviewed and discussed, and a myriad of different possible technical solutions to the frequent and numerous permit, CWA, and MRCA violations were evaluated.

In addition, this Court appointed two individuals to monitor and supervise the negotiations. Dr. Bulkley and Mr. Moon were involved in the process extensively. They even-handedly tried to assist the parties in bridging the gaps that separated the parties. On more than one occasion, this Court became actively involved in the negotiations.

During the negotiations, basement flooding was discussed. Basement flooding had occurred in the past, and all parties were interested in developing a system and a future process that would ensure that the upgraded system both eliminated basement flooding and the extensive raw sewage discharges that occurred through the open bypass points. Thus, the size of the additional retention capacity was a significant issue.

Plaintiffs and Defendants stood at odds over the closure of bypass points. Defendants sought to keep open as many bypass points as possible. Plaintiffs sought to require closure of as many bypass points as were consistent with the requirements of the CWA. The result of the negotiations was a compromise: Defendants were entitled to keep eight bypass points open – 8.0, 10.1, 2.0, 3.5, 4.0, 2.1, 3.0 and 3.1; Defendants were required to close the remaining ones, including the five they now seek to leave open for yet another year of purported "study." This negotiated resolution was the result of a painstaking and time-consuming process. Plaintiffs did

4

not then -- and do not now -- believe that Defendants need eight bypass points to accomplish the

objectives of saving human life, protecting the public health, and mitigating severe damage to

property. However, Plaintiffs are willing to "stick" with the bargain they struck because there are

no "significant changes" or "exceptional or extraordinary circumstances" that would justify any

efforts by Plaintiffs to secure the closure of additional bypass points.

The negotiation process was thorough, supervised, and transparent. No parties could then

claim – nor can they now claim – that they were or are unaware of the obligations they agreed to.

The Decree was finalized only after approval by the Department of Justice and the Michigan

Attorney General's Office, formal opportunity for public comment, and approval by this Court.

Under the Consent Decree, Defendants were required, inter alia, to eliminate excessive

infiltration and inflow ("I/I") in the collection system, upgrade and expand the Wyandotte Waste

Water Treatment Plant ("WWTP"), enlarge the capacity of the regional storage and transport

system, and eliminate certain bypass points.[1]

### B.     The Defendants' Motion to Amend and Riverview's Motion

On June 5, 2002, Wayne County and the Downriver Communities filed a Motion to

Amend the May 24, 1994 Consent Decree, which they renewed on August 19, 2002. In their

Motion to Amend, Defendants seek to extend the deadline for sealing or removing bypasses 3.2,

3.3, 3.4, 4.2, and 5.1, from October 1, 2002, until October 1, 2003. Defendants seek this

extension purportedly to collect technical support information on the system's performance and

to determine the impact, if any, that elimination of these bypasses would have on basement

---

[1] The Consent Decree has been amended twice since it was entered. Neither of these amendments is relevant to the issues of concern in this Brief. Throughout this Brief, references to the "Consent Decree" shall mean to the Consent Decree, as amended.

flooding. Defendants claim that a storm in September 2000 and a power outage in January 2002

constitute "exceptional or extraordinary circumstances" under Fed. R. Civ. P. 60(b)(6), justifying

a Court order modifying the Consent Decree.[2]

The City of Riverview is more transparent than the other Defendants in seeking its

Consent Decree modification. Riverview seeks to keep Bypass Point 5.1 open permanently.

Bypass Point 5.1 is a sanitary sewer overflow ("SSO") bypass, meaning that when activated,

Bypass Point 5.1 discharges raw, untreated sewage into the river. The City of Riverview

candidly admits that obtaining additional data does not matter. Riverview sees no reason to delay

a ruling on the merits for one more year. Riverview bases its Motion on the highly unusual

contention that its proposed change to the Consent Decree does not constitute a "modification" at

all; rather, allowing SSO 5.1 to remain open will "effectuate the Court's existing orders."

Riverview Memorandum at 7. In the alternative, Riverview asserts that significant changes in

facts or law warrant modification of the Consent Decree under Fed. R. Civ. P. 60(b)(5). Id. at 12.

The Defendants seek to keep open five bypass points even though the basement flooding

that troubles them occurred *well prior* to completion of the expansion of the Wyandotte WWTP

and regional transport system and even though several substantial and thorough studies involving

the effect of heavy rains on the performance of the completed system already have demonstrated

that the eight bypass points that will remain open are more than sufficient to save human life,

---

[2] At the time Defendants filed their Motion on June 5, 2002, they indicated that they sought to keep six bypass points open, the five enumerated in the text above and a bypass point designated as 6.0. By letter dated August 19, 2002, however, the City of Ecorse now is prepared to take the action necessary to prevent the use of bypass point 6.0 for any sanitary discharges. If the City of Ecorse fulfills its August 19, 2002 commitment, five, not six, bypass points are at issue. However, Ecorse must fulfill the commitments. Plaintiffs will inquire at the August 30, 2002 hearing about this.

protect the public health, and mitigate severe damage to property. Defendants have presented *no*

evidence to support their claim for relief. They clearly have not demonstrated that a "significant

change in circumstances" under Rule 60(b)(5) or "exceptional or extraordinary circumstances"

under Rule 60(b)(6) justifies a modification of the Consent Decree.

## III.    ARGUMENT

Fed. R. Civ. P. 60(b) provides, in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or a
> party's legal representative from a final judgment, order, or proceeding for the
> following reasons: (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence . . .; (3) fraud . . .; (4) the judgment is void;
> (5) . . . it is no longer equitable that the judgment should have prospective
> application; or (6) any other reason justifying relief from the operation of the
> judgment.

The decision to grant or deny motions under Rule 60(b) is discretionary with the district court.

Davis v. Jellico Community Hospital, Inc., 912 F.2d 129, 132 (6th Cir. 1990). As several courts

have stated, however, Rule 60(b) authority should be exercised with special caution when the

judgment at issue is a consent decree negotiated by the parties, as opposed to a judgment entered

by the Court. See Bellevue Manor Associates v. United States, 165 F.3d 1249, 1253 n.4 (9th Cir.

1999) ("[i]t might be argued with some force that there is even less of a basis to disrupt a consent

decree to which all parties agreed (which truly partakes in part of the nature of a contract) than a

court-issued final judgment that has been contested by at least one party"); W.L. Gore & Assoc.,

Inc v. C.R. Bard, Inc., 977 F.2d 558, 560 (Fed. Cir. 1992) ("[w]hen litigation is ended by the

deliberate choice of the parties, a movant's burden for modification of a consent order is

particularly heavy").

7

**A.  Defendants Have Not Presented Any Evidence that a "Significant Change in Circumstances" Justifies Relief under Rule 60(b)(5) from the Consent Decree's Requirement that Defendants Close Five Bypass Points by October 1, 2002, nor Have Defendants Demonstrated that Leaving the Bypasses Open is "Suitably" Tailored to the Alleged Changed Circumstances They Complain Of**

To justify modifying a consent decree under Rule 60(b)(5) and the relevant case law,

Defendants bear the burden of showing that "a significant change in circumstances warrants

revision of the decree." Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383 (1992); cited

in Vanguards of Cleveland v. Cleveland, 23 F.3d 1013, 1018 (6th Cir. 1994); Mountain Gold

Properties, Inc. v. Lathrup Village, et al., 874 F. Supp. 769, 772 (E.D.Mi. 1995) (Feikens, J.).  "If

the moving party meets this standard, the court should consider whether the proposed

modification is suitably tailored to the changed circumstance." Rufo, 502 U.S. at 383;

Vanguards, 23 F.3d at 1018; Mountain Gold, 874 F. Supp. at 772.  Defendants neither meet their

burden of showing a significant change in circumstances nor their burden to demonstrate that the

proposed modification is suitably tailored to the allegedly changed circumstance.

**1.  This Court should Reject the Proposed Consent Decree Modification Because the Events that Supposedly Justify the Modification Were Anticipated at the Time the Defendants Entered Into the Decree**

The Supreme Court in Rufo made it clear that "modification should not be granted where

a party relies upon events that actually were anticipated at the time it entered into a decree."

Rufo, 502 U.S. at 385; Vanguards, 23 F.3d at 1018.  All parties in this case anticipated that

severe wet weather events could and would happen after entry of the Decree.  Prior severe storms

-- such as the historical storm of July 11, 1979, resulting in three inches of rain falling in a two

hour period -- were well-known at the time of the negotiations.  In addition, basement flooding

8

occurred prior to the entry of the Consent Decree and was discussed in the course of the

negotiations. Wet weather events resulting in the discharge of raw sewage to the Detroit River

were a significant reason for the action taken by the United States and the State. Stated

otherwise, in a very real sense, the occurrence of severe wet weather not only was known at the

time, it was a core consideration in many of the negotiations (for example, the negotiations

regarding the necessary size of the increased retention capacity and the number and location of

the bypasses that were permitted to remain open involved extensive consideration of wet weather

events). The Defendants have not offered any evidence that they were unaware of the possibility

of severe storms and basement flooding at the time of the negotiations for one obvious reason:

no evidence exists.

## 2. None of the Three Circumstances that Justify Relief from a Consent Decree is Present Here

The Supreme Court, the Sixth Circuit and this Court have identified three situations that

can justify revising a decree: (1) "when changed factual conditions make compliance with the

decree substantially more onerous;" (2) "when a decree proves to be unworkable because of

unforeseen obstacles;" or (3) "when enforcement of the decree without modification would be

detrimental to the public interest." Rufo, 502 U.S. at 384; Vanguards, 23 F.3d at 1018; Mountain

Gold Properties, 874 F. Supp. at 772. None of these circumstances is present here.

No Changed Factual Circumstances. As demonstrated, supra, Defendants not have

identified any unknown factual circumstances that can justify relief from closing the bypasses.

Indeed, circumstances occurring after the negotiated resolution of this case support the bargain

struck, and not the bargain that Defendants now seek. Specifically, under Paragraph 5.D of the

9

Decree, Defendants performed a Hydraulic Modeling Study during the mid- to late-90s to identify, inter alia, how any or all of the emergency bypasses allowed under the Consent Decree would be used. In this Hydraulic Modeling Study, the WWTP was assumed capable of operating at 225 MGD and runs were performed for rainfall events as follows: 4.42 inches (100 year storm), 5.0 inches, 5.5 inches, 6.0 inches. In addition, the Hydraulic Modeling Study used data from the historical storm which occurred on July 11, 1979, resulting in three inches of rain falling in a two hour period. Finally, the Study also included scenarios in which the WWTP was disabled to a capacity of 100 MGD.

Based on the hydraulic modeling runs generated from the above scenarios, the Hydraulic Modeling Study concluded that during a 100 year storm event, the construction of the proposed Regional Storage-Transport System would result in no bypasses and all flows would be contained and treated at the WWTP. Under a 5.0 inch storm, 225 MGD would be treated at the WWTP, but the remainder would be discharged through bypass points 10.1 and 4.0. Under a 5.5 inch storm, flows in excess of 225 MGD would be released through bypass points 10.1, 4.0 and 3.1. Under a 6.0 inch storm, flows in excess of 225 MGD would be released through points 10.1, 4.0, 3.1 and 2.0. Thus, even during a 6.0 inch storm, the Hydraulic Modeling Study predicted bypasses through only four points; the remaining four points that are allowed to stay open were not used at all. Finally, even when the WWTP was disabled to a capacity of 100 MGD, only two bypasses occurred, at points 10.1 and 4.0.

Now, however, Defendants argue that additional bypass points 3.2, 3.3, 3.4, 4.2, and 5.1 should remain open for another year in order to determine whether their elimination would have an impact on basement flooding. There is no need to study this question: Defendants already

10

have undertaken an extensive study of this issue through the Hydraulic Model Study.

Furthermore, Defendants have incorporated the results of this Study into their Emergency

Operation Plan (1999). Additionally, Defendants and MDEQ have utilized the results of the

Hydraulic Model Study to establish the conditions for bypass use for the eight bypass point that

will remain open. These conditions are set forth in the 1999 NPDES permits that MDEQ issued

to Defendants. Defendants' unsupported request to further "study" this issue should be rejected.

To allow five additional bypass points to remain open now makes a mockery of the negotiation

process and negates the value of the technical studies and analyses that resulted in the Emergency

Operation Plan and the 1999 NPDES permits.[3]

Additionally, the basement flooding that spawned the Defendants' current interest in

keeping five bypasses open occurred at a time prior to the implementation of all of the Consent

Decree requirements. Thus, Defendants have no basis for a current assertion that the system will

fail to handle storm events as predicted in the Hydraulic Model Study.

The Consent Decree is Not Unworkable Because of Unforeseen Obstacles. Defendants

admit that they have the capability to close the five bypass points at issue. Indeed, they require

only thirty days to complete the closures. This clearly is not a case where compliance with the

Consent Decree is technically infeasible or unworkable.

The Public Interest Will Not Be Served by Allowing the Modification. The third

situation identified in Rufo is plainly absent here because the public interest lies in eliminating

---

[3] In their Motion, Defendants contend that a January 2002 two-hour power outage also justifies additional study of the closure of the bypasses. Their assertion is without merit: Defendants concede that no basement flooding occurred as a result of this event. Moreover, power outages were well known at the time of the Consent Decree negotiations.

11

### 4. Defendants' Proposed Modifications Are Not "Suitably Tailored to the Changed Circumstance"

Under <u>Rufo,</u> a consent decree modification must be "suitably tailored to the changed circumstances." 502 U.S. at 383. The modifications sought here do not satisfy that requirement for three reasons.

<u>There is no nexus between Defendants' compliance with the Consent Decree and the basement flooding.</u> Defendants have presented no evidence that compliance with the Consent Decree caused the basement flooding. Indeed, they cannot do so. The Consent Decree required the construction of substantially increased retention capacity: such a requirement could serve only to ameliorate the effects of wet weather events, not exacerbate them.

<u>Defendants allegedly seek to further study the effects of emergency flows on the system, but Defendants already have done that extensively.</u> Under Paragraph 5.B of the Consent Decree, in 1994 and 1995, Defendants were required to develop Rehabilitation Plans and Specifications ("Plans and Specs") based on the results of a sewer system evaluation study ("SSES"). At that same time, and under the same Consent Decree Paragraph, Defendants were required to eliminate excessive inflow and infiltration ("I/I") in their collection system. In 1995, Defendants certified to Plaintiffs that they had completed the required sewer rehabilitation projects that supposedly removed I/I from their collection systems.

Under Paragraph 5.D of the Decree, Defendants were required to conduct a Flow Monitoring Program ("FMP") between April 1, 1995, and April 1, 1996. The purpose of the FMP was to measure flows remaining in the system after the I&I had been eliminated and to

provide input to a "Downriver Hydraulic Model" to verify or refine the proposed size of the

Regional Storage-Transport System. Defendants undertook the FMP in 1995 and 1996.

Under Paragraph 5.E. of the Decree, in 1996, Defendants provided to Plaintiffs detailed

findings of the completed FMP and made recommendations regarding the appropriate size for the

Regional Storage-Transport System. Defendants were required, at a ***minimum***, to propose a

system that would transport all wastewater up to the design flow of the Downriver Collection and

Treatment System for treatment ***without bypass or overflow*** to achieve and maintain continuous

compliance with NPDES permits, Clean Water Act and WRCA (emphasis added).

Finally, in the mid- to late-1990s, Defendants performed the Hydraulic Modeling Study

that was discussed supra. The Study showed which bypasses needed to remain open during

severe wet weather events.

The activities required under Paragraphs 5.B-E of the Decree clearly were intended to

address the very issue Defendants now claim they wish to "study" further. The Decree already

required studies. The results of those studies were implemented for the purpose of eliminating

excess I/I, rehabilitating the collection system, upgrading the WWTP to expand its capacity, and

constructing a Regional Storage-Transport system to hold and transport to the WWTP for

treatment the very "emergency excess flows" that Defendants now claim they want to study.

Allowing an additional study is not "suitably tailored" to the requested Consent Decree

modification.

The metering devices installed at the local community system outlets will not provide

Defendants with the data they claim they need. Defendants contend that data from the System

15

Monitoring Plan ("SMP") flow meters will enable them to determine "the potential importance

of the six referenced bypasses to the mitigation of basement flooding." Defendants' Brief at 7.[5]

Under Paragraph 12.L of the Decree, Defendants were required to develop a System

Monitoring Program. The purposes of the SMP, inter alia, were to:

    (i)    Provide a means to measure individual community flow contributions and to monitor community flows with respect to allocated capacities in the facilities;

    (ii)    Provide a means to measure flow and provide input to the Downriver Hydraulic Model on an annual basis to verify and ensure the effectiveness of the sewer rehabilitation program;

    (iii)    Provide a means to alert the WWTP operator of levels which indicate a potential for system overflows/bypasses;

    (iv)    Provide a means to correlate climatological data and the systems' responses to wet weather events, including events involving an overflow or bypass; and

    (v)    Provide a means to track individual community and County flow contributions for issuance of Act 98 sewer construction permits.

The metering devices that Defendants installed to comply with the SMP requirements of

the Decree are located at the outlets of the community systems for the specific purpose of

measuring flows into the Regional collection system. The data collected from these meters

merely identify how much flow a community is contributing to the Regional collection system.

The data from these meters do not identify which community may cause the need for a bypass, if

an emergency circumstance exists, or if there is a problem within the community system.

Finally, the meters do not interface with bypass points and do not measure how much flow is

discharged through a bypass point. Therefore, even if Plaintiffs were to agree that further studies

---

    [5] Because Ecorse has committed to undertaking the steps necessary to prohibit future use of Bypass 6.0 for the discharge of sewage, it appears that it now is only five bypass points that are in issue. See supra note 2.

16

are needed to determine the impact of bypass closures on basement flooding – which Plaintiffs do not -- these meters would not provide the necessary data Defendants seek.

Because Defendants have not provided any evidence about how data from these SMP monitoring points would be useful in determining the impact of sealed bypass points upon basement flooding, Defendants' claim that they need to study the issue further should be seen for what it is: an attempt to buy more time to avoid compliance with consent decree provisions that are unpopular. Unfortunately, the unpopularity of these provisions is not based on reality. Defendants' own Hydraulic Model Study has projected that these bypass points are not necessary to save human life, protect public health, or prevent severe damage to property. Indeed, the Hydraulic Model Study predicts just the opposite.

**B.** **The Defendants Have Not Presented Any Evidence that "Extraordinary or Exceptional Circumstances" Justify Relief under Rule 60(b)(6) from the Consent Decree's Requirement that Defendants Close Five Bypass Points by October 1, 2002**

Defendants also rely on Rule 60(b)(6) to justify their request. The Sixth Circuit "adheres to the view that courts should apply Rule 60(b)(6) only in exceptional or extraordinary circumstances." Hopper v. Euclid Manor Nursing Home, Inc., 867 F.2d 291, 294 (6th Cir. 1989); quoted in Waste Conversion, Inc. v. Kelley, 1995 U.S. App. LEXIS 6995 at 8 (6th Cir. 1994), and Olle v. Henry & Wright Corp., 910 F.2d 357, 365 (6th Cir. 1990). In doing so, the Sixth Circuit follows the Supreme Court and numerous Circuit Courts in holding that relief under Rule 60(b)(6) must be limited to "extraordinary" circumstances. Liljeberg v. Health Serv. Acquisition Corp., 486 U.S. 847, 864, n.11 (1988), Ackermann v. United States, 340 U.S. 193, 202 (1950); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 579 (10th Cir. 1996). Under Rule 60(b)(6), the

17

moving party must show that "absent relief, extreme and undue hardship will result." Waste

Conversion, 1995 U.S. App. LEXIS at 8.

Defendants have cited the severe wet weather of September of 2000 and the power outage

of February of 2002 as "extraordinary circumstances" that justify relief from the Decree.

Defendant's Brief at 6, 7. As stated supra, severe wet weather was known and anticipated at the

time of the Consent Decree negotiations. In the Hydraulic Model Study, Defendants studied the

effect of a 100 year flood -- such as the one that occurred in September of 2000 – and concluded

that when fully operational, the system could handle the flows with far fewer than the eight

bypass points that now are allowed to remain open under the Decree. While 100 year floods, by

definition, are predicted to occur only once every 100 years, a 100 year flood is not

"extraordinary" when it is an event that is anticipated and designed for.

Likewise, power outages are not "extraordinary" events. Power outages are somewhat

routine events and the possibility of power outages cannot excuse compliance with the CWA. In

any event, the power outage cited by Defendants did not cause any basement flooding.

Defendants have presented no evidence that they will suffer any hardship – let alone

"extreme and undue hardship" – by closing the five bypass points at issue. The Michigan

Supreme Court's decision in Pohutski and Jones deprives Defendants of the only possible

18

hardship that they could have suffered: liability for basement flooding. Thus, Defendants' request under Rule 60(b)(6) must be denied.[6]

## IV. CONCLUSION

The intent of the parties in negotiating this Decree and the purposes of the CWA will be undermined if the Court allows the bypasses to potentially remain in place permanently (as Defendants' study will no doubt conclude), thereby jeopardizing this Court's and Plaintiffs' longstanding efforts to achieve water quality standards. If rain and basement flooding constitute "changed circumstances" or "extraordinary circumstances" justifying relief from a Consent Decree designed to promote compliance with the CWA, Plaintiffs' national and state goals to eliminate SSOs and minimize CSOs will be unattainable.

---

[6] The City of Riverview also argues that its request to allow SSO 5.1 to remain permanently open does not constitute a material modification to the Consent Decree; rather, allowing SSO 5.1 to remain open will "effectuate the Court's existing orders." Riverview's Memorandum at 7. Riverview's assertion is frivolous. One of the primary purposes of the 1994 Consent Decree was to eliminate SSOs; not eliminating an SSO 5.1 would directly contravene that primary purpose. Moreover, changing the Consent Decree to allow SSO 5.1 to remain permanently open clearly is a material change to the Consent Decree. As stated supra, during the Consent Decree negotiations, the question of which bypasses were to remain open and which were to be sealed was hotly contested. The vigorous nature of the debate, together with the United States' and the States' clear goal of eliminating SSOs nation- and state-wide demonstrates that Riverview is requesting a material change.

Plaintiffs respectfully request that this Court deny Defendants' and Riverview's Motions

to Amend the Consent Decree.


Respectfully Submitted,

THOMAS L. SANSONETTI  
Assistant Attorney General  
Environment and Natural Resources  
      Division  
U.S. Department of Justice

JENNIFER C. GRANHOLM  
Attorney General  
State of Michigan


*Annette M. Lang* *xmv*

ANNETTE M. LANG  
Trial Attorney  
Environmental Enforcement Section  
U.S. Department of Justice  
P.O. Box 7611  
Ben Franklin Station  
Washington, D.C. 20044  
(202) 514-4213

*Pamela J. Stevenson* *xmv*

PAMELA J. STEVENSON  
Assistant Attorney General  
Natural Resources and  
      Environmental Resources  
      Protection Division  
Michigan Dept. of Attorney General  
300 S. Washington Square #530  
Lansing, MI 48913  
(517) 335-1488

JEFFREY G. COLLINS  
United States Attorney  
Eastern District of Michigan

PETER CAPLAN (P30643)  
Assistant United States Attorney  
Civil Division  
United States Attorneys Office  
211 W. Fort St.  
Suite 2300  
Detroit, MI 48226-3211  
(313) 226-9784

OF COUNSEL:  
SUSAN PERDOMO  
Office of Regional Counsel  
United States Environmental Protection Agency  
77 W. Jackson Blvd. (C-14J)  
Chicago, IL 60604

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August 2002, I caused a true copy of the foregoing **OPPOSITION OF PLAINTIFFS THE UNITED STATES AND THE STATE OF MICHIGAN TO DEFENDANTS' MOTION AND RENEWED MOTION TO AMEND THE MAY 24, 1994 CONSENT DECREE AND TO RIVERVIEW'S MOTION AND RENEWED MOTION TO ALLOW BYPASS** to be served by first-class mail, postage prepaid, on the counsel of record listed on the following pages.

_Annette M. Lang_
Annette M. Lang

## SERVICE LIST
### U.S. v. Wayne County - Case No: 87-70992

Jennifer Granholm, Attorney General
Attn: Pam Stevenson
Assistant Attorney General
Natural Resources and Environmental Quality
P.O. Bo 30217
Lansing, Michigan 48909
Tel: (517) 373-7540
Fax: (517) 335-6668

Thomas K. DiPietro
DePietro & Day, P.C.
557 Main Street
Belleville, Michigan 49811
Tel: (734) 697-3800
Fax: (734) 697-3802

Susan Perdomo
Office of Regional Counsel
Region V (C-14J)
Environmental Protection Agency
77 West Jackson Blvd.
Chicago, Illinois 60604
Tel: (312) 886-0557
Fax: (312) 886-0747

William Look
Look, Kalmbach & Look
2241 Oak Street
Wyandotte, Michigan 48192-5317
Tel: (734) 285-6500
Fax: (734) 285-4160

Dr. Jonathan W. Bulkley
1915 Scottwood
Ann Arbor, Michigan 48104

L. Michael Wicks
Attn: Peter Caplan
Assistant U.S. Attorney
211 West Fort Street, #2300
Detroit, Michigan 48226-3211
Tel: (313) 226-9760
Fax: (313) 226-3800

Stephen J. Hitchcock, Esq.
Cox, Hodgman & Giamarco, P.C.
201 West Big Beaver, 5th Floor
Troy, Michigan 48084-4160
Tel: (248) 528-2200
Fax: (248) 528-2773

Edward Zelenak, Esq.
2933 Fort Street
Lincoln Park, Michigan 48192
Tel: (313) 386-6400
Fax: (313) 386-7778

Beth S. Gotthelf, Esq.
Seyburn, Kahn, Ginn, Bess and Serlin
2000 Town Center
Suite 1500
Southfield, MI  48-75-1195
Tel:  (248) 351-3590
Fax:  (248) 353-3727

William J. DeBiasi, Esq.
DeBiasi & Associates, P.C.
24825 Eureka Road
Taylor, Michigan 48180-5159
Tel: (734) 946-7430
Fax: (734) 946-4710

Randall A. Pentiuk, Esq.
Pentiuk, Couvreur & Kobiljak, P.C.
Suite 230 Superior Place
20300 Superior Street
Taylor, Michigan 48180-6303
Tel: (734) 374-8930
Fax: (734) 374-8857

Patrick B. McCauley, Esq.
Sommers, Schwartz, Silver & Schwartz, PC
2000 Town Center, Suite 900
Southfield, Michigan 48075-1100
Tel: (248) 355-0300
Fax: (248) 746-4001

Kurt L. Heise
Administrative Assistant to the Mayor
City of Dearborn Heights
6045 Fenton
Dearborn Heights, Michigan 48127
Tel: (313) 277-7413
Fax: (313) 274-7765

Janet Callahan Barnes
Secrest, Wardle, Lynch, Hampton,
Truex and Morley, P.C.
30903 Northwestern Highway
P.O. Box 3040
Farmington Hills, MI 48333-3040
Tel: (248) 851-9500
Fax: (248) 851-2158

Victor T. Mitea, Esq.
Horizon Building
20600 Eureka Road, Suite 717
Taylor, Michigan 48180
Tel: (734) 284-7550
Fax: (734) 282-9505

Mary Rose MacMillan, Esq.
Wayne County
Department of Environment
415 Clifford, 5th Floor
Detroit, Michigan 48226
Tel: (313) 224-6678
Fax: (313) 237-1183

David A. Bower, Esq.
10454 West Jefferson
River Rouge, Michigan 48218-1334
Tel: (313) 842-1292
Fax: (313) 842-5290

John E. McSorley, Esq.
Garan, Lucow & Miller, P.C.
1000 Woodbridge Street
Detroit, MI 48207-3192
Tel: (313) 446-5511
Fax: (313) 259-0450

Edward D. Plato
Secrest, Wardle, Lynch, Hampton,
Truex and Morley, P.C.
30903 Northwestern Highway
P.O. Box 3040
Farmington Hills, MI 48333-3040
Tel: (248) 851-9500
Fax: (248) 851-2158